NOTICE

Decision filed 06/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 251051-U

NO. 5-25-1051

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BRADFORD S. BELT, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 23-DC-296 |
| | ) | |
| BRITTANY A. BELT, | ) | Honorable |
| | ) | Tameeka L. Purchase, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's decision to award the majority of parenting time to the mother was not against the manifest weight of the evidence. However, the circuit court's decision to grant the mother's petition to relocate was against the manifest weight of the evidence where it failed to adequately consider factors such as the parties' limited resources and historical inability to cooperate, the mother's unwillingness to foster the father's relationship with the child, and the child's need for stability.

¶ 2   The petitioner, Bradford S. Belt (Father), appeals portions of the judgment dissolving his marriage to the respondent, Brittany A. Belt (Mother). He challenges the circuit court's allocation of the majority of parenting time to Mother, arguing that the circuit court should have effected an equal division of parenting time. Father also challenges the circuit court's decision to allow Mother to relocate to Pennsylvania with the parties' child, arguing that the decision was against the

1

manifest weight of the evidence. We affirm the allocation of the majority of parenting time to Mother. However, we reverse the decision to allow relocation, and we vacate the circuit court's parenting schedule with directions.[1]

¶ 3                                    I. BACKGROUND

¶ 4     The parties married in 2019. Prior to their marriage, their relationship became polyamorous, meaning that they agreed to have multiple partners. One such partner, Elijah Belt (Eli), moved in with the parties in 2020.[2] Eli and Mother continued their relationship after Father and Mother separated.

¶ 5     A foster child, Jaiden (born August 2018), was placed with the parties in October 2022. Father and Mother legally adopted Jaiden in August 2023. Although there was conflicting testimony about the roles each individual played in taking care of Jaiden, it appears that Mother, Father, and Eli shared in the parenting duties to some extent, and the parties initially intended for Eli to be a third "equal parent" despite lacking legal standing as a parent. Mother homeschooled Jaiden, which became a contentious issue during the dissolution proceedings.

¶ 6     By the time the parties adopted Jaiden, their marriage was breaking down. Father left the marital residence soon after the adoption was finalized.

¶ 7                          A. Proceedings Prior to the Hearing

¶ 8     On September 13, 2023, Father filed a petition for dissolution of marriage and a petition for temporary relief. In the petition for temporary relief, Father sought joint parental

---

[1]This cause involves an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under Rule 311(a)(5), the appellate court is required to issue a decision within 150 days after the filing of a notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Our decision in this case was due on or before May 22, 2026. However, due to the complexity of the issues involved in this appeal, we find that good cause exists to issue our disposition outside the 150-day deadline.

[2]Eli identifies as nonbinary and the parties refer to Eli using the pronouns "they" and "them."

2

responsibilities in all areas of decision-making and shared parenting time, with the majority allocated to him.

¶ 9   On November 2, 2023, Mother filed a counterpetition for temporary relief. She requested all decision-making responsibilities and the majority of parenting time. She further requested that Father be given supervised parenting time, alleging that this was necessary because Father (1) left the child alone to run an errand on one occasion; (2) did not always hear Jaiden when she needed care because Father was sleeping soundly or playing video games rather than listening for her; (3) was "physically intimidating" and "verbally abusive" toward Mother in the presence of the child; and (4) had unaddressed mental health concerns, as evidenced by his claim that he engaged in self-harm. Mother also requested temporary child support and temporary possession of the marital home.

¶ 10   On November 3, 2023, the circuit court entered a temporary order. In pertinent part, the order provided that Father would have parenting time with Jaiden every other weekend. Parenting time was to take place at his parents' home under their supervision. The order did not address decision-making responsibilities. The matter was set for a hearing on all remaining temporary issues.

¶ 11   On December 5, 2023, the circuit court appointed attorney Megan Nolan as guardian *ad litem* (GAL) for Jaiden. Nolan filed a preliminary GAL report on March 8, 2024. She recommended that the parties share decision-making responsibilities in all areas. With respect to parenting time, she recommended that Jaiden continue to reside primarily with Mother and that Father have parenting time every other weekend and one overnight per week.

¶ 12   On March 11, 2024, the circuit court entered an agreed temporary order. The order provided that Jaiden would reside primarily with Mother and that Father would have parenting

3

time every other weekend and overnight every Wednesday. Parenting time could now take place in Father's apartment. The order directed the parties to communicate with each other through the Talking Parents app and to inform each other of any doctor appointments, medical care, or illness involving the child. The order further provided that the parties were to "maintain status quo with regards to decision-making responsibilities."

¶ 13    On October 3, 2024, Mother filed a petition to relocate, seeking permission to move with the child to Phoenixville, Pennsylvania. She alleged that before the petition for dissolution was filed, the parties jointly discussed moving to Pennsylvania to be closer to Mother's biological parents,[3] but Father changed his mind after discussing the matter with his girlfriend. Mother further alleged that she had no extended family or support network in Illinois. Although Father's parents lived in St. Louis, Mother alleged that the parties and Jaiden did not interact with them regularly. Mother alleged that due to the effects of long COVID, she was unable "to maintain employment that sustains her household income needs" without assistance from her family in Pennsylvania. She alleged that a job opportunity was available to her there that would allow her to be available to care for Jaiden.

¶ 14    Mother argued that the move would be in Jaiden's best interest because she would be able to engage with her extended family in Pennsylvania and because both Mother and child would benefit from the emotional and financial support of Mother's family. She asserted that it would be feasible to arrange parenting time for Father and that she would facilitate and encourage a relationship between Father and Jaiden.

---

[3]Mother was adopted. Her adoptive parents lived in Benton, Illinois. However, due in part to their disapproval of her polyamorous lifestyle and nonbinary partner, Mother no longer had contact with them.

¶ 15    On November 13, 2024, Nolan filed her GAL report. She first analyzed the statutory factors to consider in allocating decision-making responsibilities. See 750 ILCS 5/602.5(c) (West 2022). She found that the first factor—the wishes of the child—did not favor either party. She noted that Jaiden was too young to express a preference and that although Jaiden loved both parents, she was "clearly more comfortable with Mother."

¶ 16    Nolan then found that the child's adjustment to home, school, and the community favored Mother, again noting that Jaiden was more comfortable in Mother's home. Jaiden told Nolan that she enjoyed homeschooling with Mother, and her counselor told Nolan that Jaiden had adjustment disorder and was struggling to handle the parties' separation.

¶ 17    The report went on to analyze the next two factors, the mental and physical health of all individuals involved and the ability of the parents to cooperate in making decisions. Those factors were neutral. With regard to the parties' ability to cooperate, Nolan observed that they did not regularly communicate and had "not been working together." However, she opined that they should learn to work together and that they were capable of making joint decisions. Nolan indicated that the animosity between the parties was heightened by the conduct of Mother and Eli. She noted, for example, that they recorded parenting time exchanges.

¶ 18    Nolan then addressed the level of each parent's prior participation in significant decision-making. Nolan found that Mother made most of the decisions for Jaiden. She therefore concluded that this factor favored Mother.

¶ 19    Nolan found that the factors addressing any prior agreement or course of conduct between the parties, the wishes of the parents, the needs of the child, and the distance between the parties' residences were all neutral and did not favor either parent. With respect to the needs of the child, Nolan indicated that Jaiden would benefit from having parents willing to work together and that

5

she needed to feel secure. Addressing the distance between the parties' residences, Nolan opined that even if Mother were allowed to relocate to Pennsylvania, "the parties should still be able to communicate about major decisions and jointly decide same."

¶ 20    Nolan found that the willingness and ability of each party to facilitate and encourage the child's relationship with the other parent favored Father. She explained that Father was unable to contact Jaiden during Mother's parenting time because Mother would not speak to Father on the phone and Father had no other way to call Jaiden. By contrast, Father allowed Jaiden to call Mother and Eli any time she wanted to do so while she was in his care. In addition, Jaiden informed Nolan that Mother indicated she and Eli were "trying to have just two parents now and not be married to Daddy anymore" and told Jaiden, "Daddy is a bad person."

¶ 21    Nolan did not believe any restrictions on decision-making were necessary or appropriate. She found the remaining factors inapplicable.

¶ 22    Nolan's report next analyzed the statutory factors for determining a child's best interest in the allocation of parenting time. See 750 ILCS 5/602.7(b) (West 2022). Because there is substantial overlap in Nolan's consideration of these factors and the factors relating to allocation of decision-making responsibilities, we do not need to set forth her findings in detail. Nolan found that two of the factors—the amount of time each parent spent on caretaking functions for the child and the child's adjustment to her home, school, and community—favored Mother, while the factor addressing the ability and willingness of each party to facilitate and encourage the child's relationship with the other parent favored Father. She found the remaining factors either neutral or inapplicable.

¶ 23    In finding that Mother spent more time than Father on caretaking functions, Nolan noted that there was some dispute as to Father's role in caregiving prior to the parties' separation. Mother

6

told Nolan that Father took Jaiden to the park but was otherwise not very involved in her care, while Father indicated that he handled Jaiden's morning routine and all three parental figures took turns handling her bedtime routine. However, Nolan found no dispute that Mother handled doctor's appointments and schooling for Jaiden.

¶ 24    In addressing the child's interactions and relationship with parents, siblings, and other individuals who might impact her best interest, Nolan observed that Jaiden had good relationships with Mother, Father, Eli, and Father's girlfriend, Gwen. She noted, however, that Gwen did not participate in parenting Jaiden.

¶ 25    After commenting on the best-interest factors, Nolan next addressed the statutory relocation factors. See 750 ILCS 5/609.2(g) (West 2022). As to the first two factors, she stated that Mother's reasons for seeking to relocate were that she had no local support network and wanted to reside near her biological parents, while Father's reason for opposing the move was his concern that the distance would harm his relationship with Jaiden. With regard to the history and quality of each party's relationship with the child and whether they exercised all parenting time, Nolan noted that both parents had a good relationship with Jaiden and both exercised all the parenting time available to them.

¶ 26    In considering the educational opportunities available at both locations, Nolan observed that Jaiden was currently being homeschooled, which could continue in either location. She noted, however, that both parties expressed an intent to enroll Jaiden in public school at some point, and Father expressed an intent to determine the best Metro East school district where both parties could live. Based on "a review of the website," Nolan found that schools in the Spring-Ford, Pennsylvania, school district where Mother intended to move were comparable to those in the Metro East. Nolan did not indicate what website she reviewed in reaching this conclusion.

7

¶ 27    With respect to the presence or absence of extended family in both locations, Nolan noted that Father's extended family lived mainly in the St. Louis area and in Peoria, Illinois, while Mother's extended family lived in Pennsylvania. In assessing the anticipated impact of relocation on the child, Nolan observed that the move would mean less frequent contact between Jaiden and Father. However, she also found that the greater employment opportunities available to Mother and Eli would enhance Jaiden's standard of living.

¶ 28    In addressing the circuit court's ability to fashion a reasonable allocation of parental responsibilities, Nolan opined that if relocation were allowed, the parties could still share decision-making responsibilities, but Nolan did not believe Mother would confer with Father or include Father in decisions. She noted that allowing relocation would require a "typical long distance parenting time schedule." As to the wishes of the child, Nolan noted that Jaiden told her she wanted to move. However, Nolan did not believe Jaiden was old enough to form an independent opinion on the matter. Regarding any possible arrangements for the exercise of parental responsibilities appropriate to the parties' resources, Nolan observed that due to the limited financial resources of the parties, "transportation for parenting time could become an issue."

¶ 29    Finally, Nolan considered the need to minimize any impairment to the parent-child relationship caused by allowing the move. She expressed concern that the relationship between Father and Jaiden might be harmed, citing Father's lack of contact with Jaiden during Mother's parenting time. Nolan also noted that Father's contact information was not in any of Jaiden's devices.

¶ 30    Nolan recommended that the circuit court deny Mother's petition to relocate, allocate the majority of parenting time to Mother, and order that the parties share decision-making responsibilities in all areas. In addition, Nolan recommended that Mother, Father, and Eli attend

8

coparenting counseling sessions. Addressing Jaiden's academic needs, Nolan recommended that she be evaluated to determine whether she was at an appropriate academic level for her age. If so, Nolan recommended that she finish the year with homeschooling and enroll in a "traditional" public or private school for the next school year. If Jaiden was not on track academically, however, Nolan recommended that the parties enroll her in a public or private school immediately.

¶ 31    The academic evaluation recommended by Nolan took place sometime before the matter came for a hearing. The evaluation consisted of an online test, which Eli administered to Jaiden. The parties and Eli also began the recommended coparent counseling before the hearing.

¶ 32    In July 2025, the parties filed position statements with the circuit court in accordance with a local court rule. Mother alleged in her position paper that she had been Jaiden's primary caregiver, especially with regard to schooling and medical care. She requested sole decision-making responsibilities for health care and education but stated that she was "agreeable to joint decision-making" on religion and extracurricular activities. She noted that she was requesting leave to relocate to Pennsylvania. She asked that she be awarded primary parenting time.

¶ 33    In Father's position paper, he requested equal parenting time and joint decision-making responsibilities in all areas. He initially indicated that he believed he and Mother had communicated and cooperated with each other in parenting; however, he then stated that when he attempted to communicate with Mother, her responses were "as minimal as possible" and often included accusations. Father further alleged that Mother tried to poison Jaiden's mind against him. Father urged the circuit court to deny Mother's request to relocate. In support of this request, he emphasized Jaiden's need for stability. In addition, he stated that he believed Mother intended "to completely cut him out of [Jaiden's life] and refuse to communicate altogether" if allowed to move to Pennsylvania. Finally, Father argued that if the circuit court did not allocate parenting time

9

equally, Jaiden should continue to live primarily with Mother and that he should be given "as much [parenting time] as possible."

¶ 34                                B. Hearing

¶ 35                        1. *Father's Testimony and Evidence*

¶ 36    The hearing took place over three days on July 14, July 23, and August 22, 2025. Father testified that he lived in Shiloh, Illinois, in a two-bedroom apartment he shared with his girlfriend, Gwen. Asked about his relationship with Gwen, Father responded, "We're in a committed relationship. We've been dating for three years now." He stated that although they enjoyed living together, he eventually wanted to be able to live independently when he could afford to do so. Father testified that Gwen generally does not act as a caregiver to Jaiden during his parenting time, but they play together and Gwen occasionally gets snacks for Jaiden.

¶ 37    Father also testified about his extended family and their relationship with Jaiden. He stated that his parents previously lived in Maryland Heights, Missouri, but now lived in Mississippi. However, both of Father's brothers lived in the local area, and he saw them once every month or two. In addition, several of his aunts, uncles, and cousins lived locally. Two of his cousins had children close to Jaiden's age. Jaiden spent time with those children at family gatherings, and they got along well. Father noted that his mother's extended family had a big gathering every Thanksgiving, which included both local and out-of-town relatives.

¶ 38    Father explained the roles he, Mother, and Eli played in caring for Jaiden before the parties separated. He explained that Eli played a role in parenting Jaiden from the time she first came into their care. It was agreed at that time that the three of them would coparent Jaiden equally. Father testified that Jaiden called Eli "Zaza," explaining that there was no standard name for nonbinary parents like Eli. Father noted that Mother and Eli considered themselves to be married even though

10

they were not legally married. Father explained that he was present for a marriage ceremony between Mother and Eli that was not legally binding.

¶ 39    Concerning Mother's health issues, Father noted that she suffered from long COVID and other ailments that were exacerbated by long COVID. He acknowledged that Mother said the fatigue she experiences as a result made her "unable to work for long periods of time. Even short periods of time." He testified that although he previously believed her, he felt "conflicted about it now." Father opined that the physical demands of caring for Jaiden full time "would be more than what she's led [him] to believe she can handle."

¶ 40    Father testified about his concerns regarding Jaiden's education. He stated that Jaiden was being homeschooled by Mother and had just completed first grade. He explained that they began homeschooling when Jaiden came into their care in 2022. According to Father, he participated in her schooling at that time. In particular, he helped Jaiden with math. They used an app that gave them "general guidelines on what to do," but he could not recall the name of the app. He noted that Mother was using a different app by the time of the hearing. Father testified that he requested password and account information from Mother so he could log into the homeschool app, but she refused to provide it. According to Father, Mother told him he did not need to access the app because Jaiden was only with him on weekends. He further noted that Jaiden likewise did not have password and account information.

¶ 41    Father believed that Jaiden should be enrolled in public school. He explained that in homeschooling, she was missing out on social interactions with other children, and he believed she was falling behind on her reading ability. Father acknowledged that when Jaiden took a test to assess her progress as a homeschooled child, she placed in the 98th percentile. However, he did not believe the result was accurate. He explained that it was an online test and that only Mother

11

and Eli were present when Jaiden took it. Father believed that they helped her so she would get a high score. He acknowledged that he had no evidence to support his belief that Mother and Eli helped Jaiden take the test. Father further testified that he asked to be present for the assessment, but Mother "flatly told [him] that she was doing the test already and that it was done."

¶ 42    Father believed he could communicate and cooperate with Mother in parenting Jaiden. He acknowledged, however, that they argued frequently in their discussions via Talking Parents. He described his frustration with their communication as follows: "[W]hat I have a problem with is the scrutiny involved and taking every single word that I say and responding to it in some way with judgment or a comment, derogatory usually." He noted that Mother often provided lengthy responses to his one- or two-line messages. Father indicated that he and Mother were "pretty clear" on decisions related to religion and extracurricular activities, but they "argue[d] about just about everything" concerning Jaiden's education and medical care.

¶ 43    Father addressed the concerns Mother raised about his parenting. He first described an incident in which Jaiden fell off the bed and hit her head. The incident occurred on a Saturday night during supervised parenting time at his parents' home. According to Father, Jaiden was talking on the phone with Mother shortly before bedtime when she fell off the bed and hit her head on the dresser. He was not in the room when it happened. Father looked at Jaiden's head, put an ice pack on it, and monitored her to be sure she was feeling okay and did not have any concussion symptoms. Asked if he notified Mother about the incident, Father noted that she was aware of it because it happened while she was on the phone with Jaiden. He stated that he also discussed the matter with Mother when she picked up Jaiden at the end of the weekend. Father testified that although Jaiden did not have any concussion symptoms that weekend, he learned that she felt dizzy

12

or groggy a few days later. Mother and Eli took her to the hospital emergency room where she was diagnosed with a concussion.

¶ 44     Father discussed two additional incidents in which Jaiden bumped her head while in his care. The first incident took place while they were ice skating at a birthday party. Father left the rink and allowed Jaiden to skate on her own with another child because he felt Jaiden had learned to skate fairly well and she had not fallen. Right after he left the rink, however, Jaiden fell and bumped her head. She had a "goose egg" on her forehead after the fall. Father comforted her, put ice on her head, and again monitored her for concussion symptoms.

¶ 45     The third incident took place in a tunnel at the City Museum. According to Father, Jaiden stood up before exiting the tunnel and bumped the top of her head on the roof of the tunnel. Father took her to the museum's nurse's station where she was evaluated by a nurse. Father informed Mother of both incidents when she picked Jaiden up at the end of his parenting time. He noted that he always messaged Mother to inform her of any injuries.

¶ 46     Another of Mother's concerns was Father's willingness and ability to follow the treatment plans and advice of Jaiden's doctors and her therapist. Jaiden suffered from anxiety, adjustment disorder, attention deficit hyperactivity disorder (ADHD), and eczema. She also had an allergy or sensitivity to Red Dye 40. Father testified, "To the best of my ability I follow the doctor's orders." The following exchange then took place:

"Q. Have you not followed doctor's orders ever intentionally?

A. Never intentionally.

Q. It's happened a few times?

A. Yes."

13

When asked to clarify whether he ever "accidentally" failed to follow the orders of Jaiden's doctors or therapist with regard to managing her anxiety, Father replied, "I wouldn't be able to point to any times, no."

¶ 47 One area of concern was Jaiden's sensitivity to Red Dye 40. Father testified that Jaiden's adverse reactions to products containing Red Dye 40 included swelling of her tongue and hives. Father never witnessed these reactions, but Mother told him they occurred, and she sent him a picture of Jaiden's swollen tongue when she returned home after Father's parenting time. He noted that the most likely culprit was candy or a popsicle containing the dye. According to Father, Jaiden did not have any adverse reactions to Red Dye 40 before the parties separated. He noted, however, that they avoided it for other reasons. Father testified that Jaiden did not have a diagnosed allergy to Red Dye 40, explaining that there was no test for such an allergy.

¶ 48 Father testified that he followed all doctor's recommendations for treating Jaiden's eczema. He explained that she was required to use special gentle soaps and shampoos because of her eczema and she also used over-the-counter medications to treat it. Father testified that Jaiden always used the appropriate soaps and shampoos while in his care. However, he did not remember whether he told his parents about her eczema diagnosis.

¶ 49 Father testified that Jaiden was in counseling. He was present for some of her counseling sessions, and he sometimes talked to her therapist to learn whether she was doing well in general. He explained that he did not attend all of the sessions for two reasons. First, the sessions were scheduled during Mother's parenting times while Father was at work. Second, Jaiden's therapist told both parents not to attend sessions anymore so counseling can "be a space for [Jaiden] to just be with her." When asked about his knowledge of adjustment disorder, one of Jaiden's diagnoses,

14

Father admitted that he was "[n]ot exactly" familiar with what this was. Father supported the decision to put Jaiden in counseling and noted that it was a joint decision.

¶ 50 Father testified that Jaiden took a prescription medication for ADHD. He acknowledged that Mother believed he was generally opposed to any diagnosis or medication for ADHD. However, he believed she misunderstood his position. He explained that although he never objected to having diagnostic tests to determine whether Jaiden had the condition, he did object to Mother going forward with it without his involvement. This was because he wanted to discuss the potential side effects of medications.

¶ 51 Father responded to another issue of concern to Mother, an incident involving Gwen's dog. Father was not in the room when the incident occurred. He testified that he heard the dog bark and Jaiden cry out. Jaiden told him the dog bit her, but he did not see any marks or blood. Father comforted Jaiden and put the dog in his kennel for the rest of the night. Father testified that before the incident, Jaiden petted and played with the dog without any similar incident. Father testified that although the dog did not like other dogs, he was not aggressive to people. He believed the incident occurred when Jaiden startled the dog. Since the incident, Father and Gwen have kept the dog in his kennel while Jaiden was in the apartment. Father noted that he planned to move into his own place, so the dog would no longer be an issue.

¶ 52 In addressing Mother's allegations of violent and self-harming behavior, Father testified that shortly before he moved out of the marital home, he hit himself on the head with a metal water bottle in frustration. He was not injured, but he dented the water bottle. Father testified that Jaiden did not witness the incident, but Mother and Eli did. When he tried to discuss it with them later, they refused to do so. Father denied that he ever hit anyone or was in a physical fight.

15

¶ 53    Father acknowledged he was charged with misdemeanor battery based on allegations that he threw a bag of Jaiden's clothing at Eli during a parenting time exchange. According to Father, he tried to hand the bag to Eli, but Eli wanted him to put it on the ground instead. The incident was video-recorded because Eli recorded all parenting time exchanges.

¶ 54    Asked how he speaks about Mother to Jaiden, Father replied he did not ever speak ill of Mother and tried his "best to be as neutral as possible." When he addressed the animosity between the parties with Jaiden, he explained to her that they argued because they loved her and wanted what was best for her.

¶ 55    Asked about his ability to provide stability for Jaiden, Father stated that he was physically able to be there for her, to play with her, and to take care of her needs. He also believed he could provide Jaiden with emotional support. Further, Father noted that he had a stable job with a stable income and a work schedule that did not change often. He testified that he was employed by Critter Control. He generally worked Monday through Friday from 8 a.m. until 4 p.m. Although he occasionally worked evenings and weekends, he could turn down extra work when Jaiden was in his care.

¶ 56    On cross-examination, Father admitted that he had a conviction for driving as an uninsured motorist. He did not know how long he had lacked insurance. He testified that he drove Jaiden in his vehicle during his parenting time. By the time of the hearing, Father's car insurance was current.

¶ 57    Mother's counsel asked Father about his opposition to Mother's petition to relocate. Father acknowledged that he initially agreed to the move but later changed his mind. He explained that the original agreement was that he, Mother, and Eli would all move to Pennsylvania with Jaiden. At the time, Father worked from home. However, now that he worked for Critter Control, moving

16

to Pennsylvania would take him away from that job. Father was aware that Mother intended to enroll Jaiden in a highly rated public school district in Pennsylvania if allowed to relocate. He agreed with this decision.

¶ 58                              2. *Mother's Testimony and Evidence*

¶ 59    Mother testified that she met Father in 2014 when both were students at Southern Illinois University at Edwardsville. Mother had been adopted. Mother's relationship became polyamorous in "2016 or later," which changed her relationship with her adoptive parents. Mother explained her adoptive parents were "strict Catholics" who referred to her nonbinary partner, Eli, as "it." Her adoptive parents never met Jaiden. Mother further testified that her biological parents had always been "in and out of [her] life," but she reconnected with them on a more regular basis early in 2023.

¶ 60    Mother testified at length about the water bottle incident, which took place one week before they finalized Jaiden's adoption. On the day of the incident, Mother accompanied Father to a bank to have a document notarized. When the teller informed him that he could not notarize the document, Father became angry and yelled at the teller. Mother told him his conduct was inappropriate. When they got home, Father went to his office. He informed Mother that he had broken his water bottle, and she told him they could buy a new bottle. Mother testified that approximately 15 to 20 minutes later, Father came downstairs and screamed at Mother and Eli. He accused them of not caring that he was self-harming. Mother noted that prior to this outburst, she was unaware he was self-harming.

¶ 61    According to Mother, the water bottle incident was the first time Father behaved in that manner. However, he began having "angry outbursts," and the relationship quickly deteriorated. As a result of "these blowups and things," Mother decided to ask Father for a divorce. The first

17

night she broached the subject, Father agreed "to remain best friends" and move to Pennsylvania with Mother, Eli, and Jaiden. Subsequently, however, he became angry about the situation. On one occasion, he kicked an ottoman and screamed in a manner she described as "animalistic." This made Mother feel unsafe, so she called the police. Father left the residence and did not return.

¶ 62    Mother next testified about the concerns raised by head injuries Jaiden sustained while in Father's care. Mother believed there were several more incidents than the three Father described in his testimony. She was particularly concerned because she noticed that Jaiden was "having memory issues" after she fell off the bed at Father's parents' home. Mother explained that three or four days after that incident, Jaiden began having headaches and memory problems. Mother took Jaiden to Children's Hospital in St. Louis, where she was diagnosed with a concussion and placed on "concussion protocol" for six weeks.

¶ 63    Mother identified "Respondent's Exhibit 2" as a printout of communications between Mother and Father via the Talking Parents app on September 23, 2024, which was later admitted into evidence. The printout shows a message Mother sent to Father saying, "When we asked Jaiden how her weekend went, she told us she hit her head twice. Would you mind elaborating?" The exhibit also included Father's response, which was as follows: "She bumped her head at the playground. No bruises, no goose eggs, she's just been conditioned at this point to be afraid of anything coming into contact with her head."

¶ 64    Mother next identified "Respondent's Exhibit 3" as a printout of a thread she created on the Talking Parents app to discuss injuries Jaiden sustained while in Father's care. The exhibit was entered into evidence. Mother explained that she created the thread on June 19, 2024, to track injuries so the information could be provided to Jaiden's doctors as necessary. The exhibit contains Mother's descriptions of nine different incidents in which Jaiden sustained contusions, abrasions,

18

or sunburn while in Father's care between November 2023 and June 2024. Within the exhibit, Mother also indicated that Father failed to follow the concussion protocol in place after Jaiden fell off the bed at his parents' home. Mother testified that she found this pattern concerning. She believed that Father was not taking the precautions necessary to keep Jaiden safe.

¶ 65    Mother stated that she was the one who scheduled all of Jaiden's medical and counseling appointments. She let Father know about appointments in advance, and she provided him with a summary after each appointment.

¶ 66    Mother testified that Jaiden had eczema and sensitive skin and was prone to yeast infections. She was prescribed Nystatin cream to treat the irritation caused by her eczema and yeast infections. In addition, Jaiden must use fragrance-free soap, shampoo, and laundry detergent. According to Mother, however, Father sometimes used products that were not fragrance-free. Mother provided him with a letter from the physician's assistant at her pediatrician's office documenting the need for fragrance-free products. Mother was also concerned that Father discussed treating Jaiden's rashes with hydrocortisone cream or petroleum jelly instead of using Nystatin.

¶ 67    Mother next discussed Jaiden's sensitivity to Red Dye 40. Much of her testimony was consistent with Father's testimony on the matter. She indicated that before the parties separated, they began "cutting back" on products containing Red Dye 40 because they noticed "a correlation between Jaiden's behaviors, particularly her ADHD behaviors, and the Red 40." Mother testified that Jaiden first exhibited physical symptoms from Red Dye 40 late in 2024. Those symptoms included an itchy face and mouth, as well as a swollen tongue. Mother discussed this concern with Jaiden's doctor, but Father was not involved in those discussions. When she asked to have Jaiden tested for a Red Dye 40 allergy, she learned no such test exists.

19

¶ 68 Mother acknowledged that Father told her he would be "more vigilant" about avoiding Red Dye 40. However, Jaiden sometimes returned from Father's home complaining of a swollen or itchy tongue. Mother explained that Red Dye 40 can be found not only in food but in products such as toothpaste or over-the-counter medications. She was concerned that Father might be giving products with Red Dye 40 to Jaiden. Mother also testified that when Jaiden spent Easter with Father in 2025, she came home upset that she could eat only one item from her Easter basket because everything else contained Red Dye 40.

¶ 69 Mother identified "Respondent's Exhibit 15," which was subsequently entered into evidence, as a series of communications between the parties concerning ADHD screening for Jaiden. The exhibit began with an April 18, 2024, message Mother sent Father via Talking Parents in which she summarized Jaiden's appointment with her therapist, Taylor Bobzien. Toward the end of the message, Mother informed Father that Bobzien recommended ADHD screening for Jaiden and offered to put in a referral to a psychiatrist for the screening. Mother asked Father if he would agree to the screening. The printout shows that Father viewed the message about five minutes after it was sent; however, he did not respond.

¶ 70 The next message in "Respondent's Exhibit 15" was sent by Mother on April 21, 2024. She wrote, "Given your lack of engagement regarding Jaiden's mental healthcare, I'm going to take your choice not to respond to the question about seeing a psychiatrist as consent." Father responded, "I've been waiting on a call from Taylor, so I can discuss everything and ask my questions directly to her. You do not get to make decisions about Jaiden['s] health without me. Ask Taylor to please return my calls, and then we can move forward."

¶ 71 Finally, the exhibit contains a May 8, 2024, message from Father to Mother indicating that he had spoken with Jaiden's therapist and would now agree to the referral for ADHD screening.

He also stated, "I want Jaiden to see a physician that can give her an ADHD diagnosis, and I want Jaiden to receive medication if it will be helpful. My only stipulation is that I talk to the physician myself before Jaiden starts any medication."

¶ 72    Mother testified that Jaiden was eventually diagnosed with ADHD. She had a prescription for Guanfacine to treat it.

¶ 73    Mother stated that she expressed concern to Father about Jaiden being around Gwen's dog. She noted that the dog growled at Mother and Eli nearly every time they interacted with him. Jaiden told Mother that the dog bit her, which Father denied. Mother testified that the bite "did not break the skin but you could see redness." She acknowledged that the dog once stayed overnight at the marital home in Alton and there were no problems.

¶ 74    Next, Mother testified about Jaiden's education. She stated that Father initially agreed to homeschooling. They chose to homeschool Jaiden because they were concerned about reports of violence in the Alton schools she would otherwise attend. They were also concerned that Jaiden might not be accepted due to her parents' polyamorous household. Mother testified that she and Eli did all the homeschooling. She denied that she refused to give Father account and login information on the homeschool app. To the best of her knowledge, he never requested such information. Moreover, Jaiden's tablet always remained logged into the program she used for school.

¶ 75    According to Mother, Jaiden was above her grade level in reading. She explained that the assessment test she took was administered by Eli. Mother was home at the time, but she stayed out of the room where Jaiden was taking the test "to avoid any disagreement about it." She noted, however, that she was in the next room and could see Eli and Jaiden. She was therefore aware that Eli did not give Jaiden answers.

¶ 76 Mother testified at length in support of her request to relocate. She wanted to move to Pennsylvania to be closer to her family where she would have the "extra support system" her parents could provide. She noted that she had no support system locally. Mother planned to live with her parents until she and Eli found a house.

¶ 77 Mother further testified that in addition to a few visits, Jaiden had regular contact with Mother's parents through phone calls and video chats almost every week. She typically saw Father's brothers and extended family three times a year at family gatherings for major holidays.

¶ 78 Regarding the financial benefits of the proposed move, Mother testified that she would be able to work for her father because he would be willing to accommodate the limitations that resulted from her chronic medical conditions. She had been diagnosed with long COVID, postural orthopedic tachycardia syndrome (POTS), and Ehlers-Danlos syndrome. She explained that POTS is an autoimmune disorder that caused her heart rate to go up when she stood up or changed positions, leading to dizziness. Ehlers-Danlos syndrome can cause pain. Mother's symptoms changed from day to day, and most employers would not understand if she needed to lie down during the day because of dizziness. Mother last worked as a veterinary technician in 2023. She stated that even with accommodation, she got sicker. She acknowledged that she had not worked or applied for other jobs since that time.

¶ 79 As to the educational opportunities in both locations, Mother testified that the schools in the Spring-Ford district in Pennsylvania, where she hoped to relocate, had a higher overall rating than the schools in Alton, where she currently lived. "Respondent's Exhibit 20," which provided rankings of various aspects of both districts, supported her testimony. Mother also noted that the Spring-Ford district had a "hybrid" program consisting of both in-person and home learning. Mother believed this program "would be a good transitional step" for Jaiden.

¶ 80    Mother testified that Jaiden was close friends with some neighborhood children who, like Jaiden, were adopted. Jaiden also made friends with children she met in her jujitsu and swimming classes, but these were not close friends. Mother stated that because the marital home was going to be sold after the dissolution was finalized, Jaiden would have to move out of the neighborhood and make new friends regardless of whether the circuit court allowed Mother to move to Pennsylvania.

¶ 81    Mother believed moving to Pennsylvania would be in Jaiden's best interest because Jaiden loved being around her grandparents, aunts, uncles, and cousins who live there. Jaiden also enjoyed the cultural opportunities available in nearby Philadelphia, such as museums and a zoo, but Mother acknowledged that there were similar opportunities available in St. Louis. Mother also felt it was a more accepting environment for a child to be seen in public with "a two-female couple."

¶ 82    Mother denied Father's claim that she spoke ill of him to Jaiden. She stated, "I really don't talk about him." Moreover, she indicated that she heard Father say bad things about her to Jaiden. On cross-examination, Mother was asked to read from the GAL's report where it said, "[Jaiden] said that Mommy says that Daddy is a bad person." Asked if Jaiden made this up, Mother replied, "I think [Jaiden] misunderstood." She admitted that she told Jaiden that Father lied to her and surmised that Jaiden associated lying with being a bad person.

¶ 83                                3. *Additional Witnesses*

¶ 84    Eli testified that they were trying to set up a reptile-breeding business. Eli currently had an inventory consisting of the snakes that would be bred and the "racks" that housed the snakes. However, Eli was unable to sell any snakes without an Illinois license, which they were working to obtain. The snakes were kept in a second-floor room in the home Eli shared with Mother and Jaiden. The room was locked, and Jaiden could not access it. Although the racks housing the snakes

23

did not lock, they were child-proof. Eli noted that there were also two pet snakes in the home, which belonged to Mother and Jaiden, respectively. The pets lived in the same room as the breeding snakes.

¶ 85    Eli opined that Father did not listen to Jaiden's concerns. On one occasion, Eli witnessed Father masturbating while looking at pornography on the computer in his office, which had an open door. Although Eli never saw Father act aggressively toward Jaiden, Father often exhibited unpredictable aggressive behavior during arguments with Mother and Eli. For example, during one argument, he kicked an ottoman out of the way, spilling drinks. Eli noted that Father would often shake his fist, stomp his feet, and scream. Eli testified that Jaiden often said she did not want to go to Father's home and that she is "usually scared" when she is there.

¶ 86    By contrast, Eli believed that Mother was a good parent to Jaiden. Eli had no concerns about the impact of Mother's medical conditions on her ability to care for Jaiden. Eli acknowledged, however, that when Mother had a "flareup," she had to "go about [caring for Jaiden] in different ways."

¶ 87    Eli testified about the altercation with Father over a bag of Jaiden's clothes. According to Eli, they asked Father to set the bag down, then looked away to check on Mother, who was getting Jaiden in the van. When Eli turned back, Father struck them in the face with a bag of wet clothes.

¶ 88    Next, Mother's biological father, Stephen Gunnin, testified that he had reestablished a relationship with Mother in March of 2023. Since that time, Mother and Jaiden had visited with him twice in Pennsylvania, and he had visited them in Illinois five times. Each of these visits lasted one week. Two of the five visits to Illinois took place before the parties separated. Asked what he observed about Father's interactions during those visits, Gunnin testified that although Father was involved in some caregiving and activities with Jaiden, Mother and Eli were more involved and

24

did most of the caregiving. On cross-examination, he acknowledged that during his second visit to Illinois, he learned that Father had been asked not to participate in family activities.

¶ 89    Gunnin testified that, since the separation, he provided Mother with an average of $2,000 to $4,000 each month. He intended to continue helping her, but this level of financial support was not sustainable for him in the long term. He opined that it would be easier for him to help Mother if she were allowed to relocate to Pennsylvania because that would allow her to stay in his home. In addition, he and his wife would be able to help with childcare.

¶ 90    Gunnin testified that he could offer Mother a job that would allow her to work around both her medical limitations and Jaiden's homeschooling schedule. He could also help Eli get a job with a business owned by someone he knows. On cross-examination, he explained that he and his wife managed the storage business where he could offer Mother a job, but they did not own the business.

¶ 91    Bryan Belt (Bryan), Father's father, testified that he and his wife had a close relationship with Father. Although they were both from the St. Louis metropolitan area, they moved to Gulf Port, Mississippi, in January 2025. He noted that all three of his sons lived in the St. Louis metropolitan area and that most of his wife's large extended family also lived locally. Before the Belts moved to Mississippi, they typically saw Father once a month. Since the move, they tried to schedule their visits to the St. Louis area to coincide with Father's parenting time.

¶ 92    When asked to describe his observations of Father as a parent, Bryan stated, "[Father] relishes his time with [Jaiden]." When Father's parenting time took place at the Belts' home, Father was very attentive to Jaiden. He took her to the park and the splash pad near the house and played games with her at home.

¶ 93    Bryan testified about the incident in which Jaiden fell off the bed during Father's parenting time with her at the Belts' home. According to Bryan, Jaiden was jumping on the bed when she

25

fell. Father calmed her down, put ice on her head, and monitored her for symptoms. Bryan did not see a bump on Jaiden's head.

¶ 94    Bryan recalled that Father told him Jaiden had either an allergy or sensitivity to Red Dye 40 when he offered her a Dorito. Father cautioned his parents to be careful about anything they gave Jaiden to eat. According to Bryan, once they were aware of the issue, they were careful to avoid giving Jaiden any food containing Red Dye 40.

¶ 95    Father's mother, Melanie Belt (Melanie), testified that she had seven brothers and sisters and that most of her siblings and their children and grandchildren lived in St. Louis or in Madison and St. Clair Counties in Illinois. She confirmed Father's testimony that the family has a big Thanksgiving gathering each year, but she did not otherwise testify about the relationships between Jaiden and her extended family. Melanie opined that Father did "a great job" of being a parent.

¶ 96    Regarding Jaiden's fall from the bed in the Belts' home, Melanie testified that Jaiden was "bouncing on the bed" when it happened. Although Melanie was in the next room, she could hear the bed springs squeaking. She heard Jaiden fall a few seconds after she started bouncing, but she did not see it. According to Melanie, Father handled the situation appropriately. He put an ice pack on Jaiden's head, held her in his lap to comfort her, and made sure she was okay.

¶ 97    Melanie was aware of Jaiden's sensitivity to Red Dye 40. Consequently, she was careful about the snacks she offered Jaiden. She acknowledged, however, that she unintentionally included an item containing Red Dye 40 in Jaiden's Easter basket.

¶ 98    Father's girlfriend, Gwen Perrine (Gwen), testified on Father's behalf.[4] Gwen and Father lived together in a two-bedroom apartment in Shiloh where Jaiden had her own bedroom. Gwen

----

[4]Gwen is Father's partner whose legal name is Owen Perrine. However, all parties and witnesses refer to her as Gwen.

described Father as "a very caring person" who was honest and "works really hard." She felt that he was also a good father to Jaiden. Asked to elaborate, Gwen stated that he took good care of Jaiden, comforted her when she was upset, and took the time to explain the circumstances to her.

¶ 99    Gwen testified that she did not see Jaiden often. She noted that she typically arrived home from work at 2:30 a.m. and slept until 10:30 or 11 a.m. When Jaiden stayed with Father and Gwen, Father provided most of her care, but Gwen sometimes did "small things" to help care for her. In addition, Gwen played games with Jaiden and painted and colored with her.

¶ 100   Gwen was asked about her dog. She described him as a good dog who was not aggressive. Although the dog had never bitten anyone, he did sometimes growl, and there was an incident in which he growled at Jaiden. Gwen testified that Jaiden used to play fetch with the dog, but after the incident, they kept him in his kennel any time Jaiden was in the apartment. According to Gwen, the dog growled at Jaiden but did not bare his teeth. On cross-examination, however, she acknowledged that she was not home when the incident occurred.

¶ 101   The final witness was the GAL, Megan Nolan. Nolan testified that prior to the parties' separation, Father, Mother, and Eli "were actively involved with JJ." Mother did most of the homeschooling; Eli did most of the cooking; and Father took Jaiden to the park, played with her, and did "things like that." Nolan stated that her recommendations had not changed since she filed her report in November 2024.

¶ 102   Regarding the allocation of decision-making responsibilities, Nolan opined that Mother and Father were capable of making joint decisions for Jaiden and working together. She testified, however, that "they need some help with their communication," such as coparenting counseling and the use of a communications app.

27

¶ 103   Nolan further testified, "I feel like much of the animosity between the parties is heightened by Mother and Eli's actions." As an example, she highlighted the "incident where Eli wouldn't take a bag of clothes from [Father]." She also noted that most parenting time exchanges are video-recorded, something that is not necessary.

¶ 104   Nolan did not believe Mother was promoting Jaiden's relationship with Father. She noted that Jaiden picked up on Mother's animosity toward Father. Nolan also stated that Father was unable to call Jaiden during Mother's parenting time because Jaiden did not have her own phone and Father was not allowed to call Mother. In addition, Jaiden's tablet had contact information for Mother, Eli, and Mother's parents, but did not have contact information for Father or his parents. Nolan was asked about the statement in her report indicating that Mother told Jaiden, "Daddy is a bad person." In response, she explained that Jaiden told her Mother said this. Nolan did not believe Jaiden ever lied to her. She further testified that the last time she saw Jaiden, Jaiden referred to Father as "Brad." When Nolan asked her why, Jaiden said she does not see Father as her father. Nolan stated, "And I asked her why that was, and she indicated that he's a bad person and Mommy and Zaza think he's a bad person."

¶ 105   As to her recommendation that the circuit court deny Mother's petition to relocate, Nolan opined that Mother would not confer with Father on decisions involving Jaiden if allowed to relocate. When asked to explain, Nolan testified, "So I think that she would keep [Father] advised of things that the Court says that she needs to tell him about, but I don't know that on a regular basis there would be a lot of conferring about what things to enroll in or whatnot." Moreover, Nolan believed that transportation would be a problem if the petition were granted. She explained that air fare would likely be cost-prohibitive due to the parties' limited financial resources, and the lengthy drive between the two locations "essentially takes two days' worth of travel." Nolan was

28

also concerned that Jaiden's relationship with Father would deteriorate. She explained that a long-distance parenting time schedule would involve "long periods of time in between her seeing him." She reiterated her previous testimony that Father did not have contact with Jaiden during Mother's parenting time. She testified, "I don't see how they would maintain a close relationship when [Jaiden] doesn't talk to him when she's not with him."

¶ 106 The circuit court took judicial notice of the GAL's report. Both parties indicated that closing arguments were not necessary and the court took the matter under advisement.

¶ 107 C. Circuit Court's Ruling and Subsequent Proceedings

¶ 108 On September 17, 2025, the circuit court entered a judgment of dissolution. The circuit court first discussed the statutory factors applicable to the allocation of parental decision-making responsibilities. See 750 ILCS 5/602.5(c) (West 2024). The circuit court noted that there was no evidence concerning the wishes of the child, and given her young age, this was not a significant factor (750 ILCS 5/602.5(c)(1) (West 2024)). Regarding the child's adjustment to her home, school, and community, the circuit court found that Jaiden was well adjusted to her current home in Alton, but noted that she would be moving from that home due to the sale of the marital residence (750 ILCS 5/602.5(c)(2) (West 2024)). With respect to the physical and mental health of all individuals, the circuit court noted that the child was in therapy and both Mother and the child had medical conditions (750 ILCS 5/602.5(c)(3) (West 2024)).

¶ 109 Addressing the parents' ability to cooperate in decision-making and the extent to which conflict between them affects their ability to share decision-making (750 ILCS 5/602.5(c)(4) (West 2024)), the circuit court noted that the parties presented "a number of communications from Talking Parents that show difficulty in communicating between the parties, including in a timely manner to address the needs of the child."

29

¶ 110 The circuit court addressed the level of each parent's past decision-making and any agreement or course of conduct between the parties (750 ILCS 5/602.5(c) (West 2024)). The circuit court noted that Mother told the GAL she had been the primary decision-maker during the marriage and that, although there was testimony that Father may have initially agreed to homeschool Jaiden, there was also evidence that he "was never in agreement" on that point and Mother and Eli disregarded his wishes.

¶ 111 As to the child's needs (750 ILCS 5/602.5(c)(8) (West 2024)), the circuit court highlighted the GAL's opinion that Jaiden needed parents who could work together. Regarding the distance between the parties' residences (750 ILCS 5/602.5(c)(9) (West 2024)), the circuit court found that the distance was not presently significant, but the distance would be significant if Mother relocated to Pennsylvania.

¶ 112 In considering the willingness and ability of each parent to foster a close and continuing relationship between the other parent and the child (750 ILCS 5/602.5(c)(11) (West 2024)), the circuit court first noted that there was conflicting testimony about whether each parent said negative things about the other in front of Jaiden. The circuit court found Father's testimony that he generally did not talk about Mother to the child at all "raises concerns."[5] Finally, the circuit court noted that Mother's testimony describing her concerns over Father's willingness and ability to follow treatment plans for Jaiden was supported by the Talking Parents communications entered into evidence.

¶ 113 The circuit court next considered the statutory best-interest factors for allocation of parenting time. In pertinent part, the circuit court set forth each party's requests for parenting time (750 ILCS 5/602.7(b)(1) (West 2024)) and noted that there was conflicting testimony concerning

___

[5]We note that it was Mother who testified that she did not speak about Father.

the amount of time each parent spent performing caretaker functions for the child (750 ILCS 5/602.7(b)(3) (West 2024)). With regard to the child's interaction with her parents, siblings, and any other individual who might significantly impact her best interests (750 ILCS 5/602.7(b)(5) (West 2024)), the circuit court found that both parties loved the child and she loved them. The circuit court further found that the child did not have a significant relationship with Father's partner, Gwen, while Mother's partner, Eli, was involved in her life as an equal parent. In addressing the willingness and ability of each parent to put the child's needs ahead of the parent's needs (750 ILCS 5/602.7(b)(12) (West 2024)), the circuit court highlighted Mother's concerns with Father's willingness to follow treatment plans and the concerns expressed by Father and the GAL about Jaiden's awareness that Mother and Eli do not like Father.

¶ 114 Next, the circuit court addressed the statutory relocation factors. In pertinent part, the circuit court found that (1) the circumstances and reasons Mother sought to relocate included the support of her biological parents and the prospect of a job that would allow her to work around her medical needs (750 ILCS 5/609.2(g)(1) (West 2024)); (2) Father opposed the relocation because it would limit his contact with Jaiden (750 ILCS 5/609.2(g)(2) (West 2024)); and (3) the parties disagreed as to whether the circuit court would be able to fashion a reasonable allocation of parenting time if the petition to relocate were granted (750 ILCS 5/609.2(g)(7) (West 2024)). Regarding the history and quality of each party's relationship with the child (750 ILCS 5/609.2(g)(3) (West 2024)), the circuit court stated that both parents had a good relationship with Jaiden, but Mother and Eli were her primary caregivers.

¶ 115 In considering the educational opportunities at both locations (750 ILCS 5/609.2(g)(1) (West 2024)), the circuit court noted that the GAL's opinion that the Spring-Ford schools in Pennsylvania were comparable to the Alton schools was not consistent with the evidence of ratings

31

Mother presented. In addressing the anticipated impact relocation would have on the child (750 ILCS 5/609.2(g)(6) (West 2024)), the circuit court noted that Jaiden would be moving regardless of whether the request to relocate was granted.

¶ 116   As to the presence or absence of extended family members at each location (750 ILCS 5/609.2(g)(5) (West 2024)), the circuit court noted that Mother has no contact with her adoptive parents and no other local family members, Father's parents no longer live in the area, and he generally only sees his local family members at holiday gatherings. The circuit court also noted that Father's brothers do not have children. By contrast, Jaiden had bonded with Mother's biological parents and extended family in Pennsylvania.

¶ 117   In conclusion, the circuit court expressly found that it would be in Jaiden's best interest for Mother to have sole responsibility for decisions related to medical care and education, for the parties to share decision-making responsibilities for religion and extracurricular activities, and to allow Mother to move to Pennsylvania with the child. The judgment of dissolution incorporated a separate judgment containing a parenting plan. That plan allocated decision-making responsibilities in accordance with the findings set forth in the dissolution judgment. It provided that Mother must consult and confer with Father in exercising her decision-making authority and that both parties must foster the child's relationship with the other parent and refrain from making disparaging remarks about each other in her presence. The plan included a parenting time schedule giving Mother the majority of parenting time. In addition, it provided that each party must be allowed to communicate with the child by telephone or electronic communications and that Mother, Father, Eli, and all grandparents must be included as contacts on Jaiden's devices.

¶ 118   Both parties filed motions to reconsider aspects of the dissolution judgment. In pertinent part, Father argued that the circuit court erred in its allocation of decision-making responsibilities

32

and in allowing Mother to relocate. The circuit court granted Mother's motion to reconsider, which addressed only the distribution of certain marital assets; granted Father's motion to reconsider in part; and denied most of the requests in Father's motion, including those related to parental responsibilities and relocation. This timely appeal followed.

¶ 119                                 II. ANALYSIS

¶ 120                          A. Allocation of Parenting Time

¶ 121    Father first argues that the circuit court erred in allocating the majority of parenting time to Mother. We disagree.

¶ 122    Circuit courts must allocate parenting time in accordance with the best interests of the child. 750 ILCS 5/602.7(a) (West 2024). In determining the best interests of the child, circuit courts must consider all relevant factors, including: (1) the wishes of each parent; (2) the wishes of the child, taking into account the child's maturity and ability to express a preference related to parenting time; (3) the amount of time each parent spent on caretaking functions for the child in the two years before the petition requesting an allocation of parenting time was filed; (4) any prior agreement or course of conduct between the parents; (5) the child's relationship and interaction with parents, siblings, and any other individuals who might significantly affect the child's best interests; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all the individuals involved; (8) the needs of the child; (9) the distance between the parties' residences, the cost and difficulty of transporting the child, the daily schedules of the child and the parents, and the parents' ability to cooperate; (10) whether a restriction on parenting time is appropriate; (11) any physical violence or threat of violence; (12) the willingness and ability of each parent to place the child's needs ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage the relationship between the child and the other

33

parent; (14) any abuse against the child or any member of the household; (15) whether either of the parents is a convicted sex offender or lives with a convicted sex offender; (16) the terms of a parent's military family-care plan if the parent is a military member who is being deployed; and (17) any other factor the circuit court expressly finds relevant. 750 ILCS 5/602.7(b) (West 2024). Although the circuit court must consider all applicable factors, it need not make explicit findings or references to each factor. *In re G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 123    The circuit court is "in the best position to assess the credibility of witnesses and determine the child's best interests." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15. It is also in the best position to observe the temperaments and personalities of the parties. *Whitehead*, 2018 IL App (5th) 170380, ¶ 21. As such, we accord great deference to the circuit court's decision regarding parenting time. *Whitehead*, 2018 IL App (5th) 170380, ¶ 15. We will not reverse the circuit court's allocation of parenting time unless it is against the manifest weight of the evidence, manifestly unjust, or the result of an abuse of discretion. *In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 86; *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 124    In arguing that the circuit court erred in its allocation of parenting time, Father first asserts that he "had significant involvement prior to the parties' separation, as they shared duties with each performing one-third of the child's needs." However, while there is evidence in the record to support this claim, that evidence is not uncontroverted. Mother and Eli testified that Father was not very involved in caregiving prior to the parties' separation. Mother's father likewise testified that when he visited the family in Illinois before the parties' separation, Father did not participate in most family activities. Where there is conflicting testimony, the credibility of witnesses is best left to the circuit court, as the trier of fact, "because it alone is in the position to see the witnesses,

34

observe their demeanor, and assess the relative credibility of witnesses." (Internal quotation marks omitted.) *Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 125   Father also points to "extremely troubling" evidence that Mother refused to provide him with "fundamental information regarding the child's education, to include the account and password for the home-schooling program." Again, however, there was conflicting evidence on this question. While Father testified that Mother refused to provide him with this information, Mother testified that he never asked for the information and that Jaiden remained logged into the homeschooling program on her tablet.

¶ 126   In perhaps his strongest argument, Father points to evidence that Mother made disparaging remarks about him to the child and the GAL's concern that Mother attempted to undermine Father's relationship with Jaiden. As he correctly points out, the willingness and ability of a parent to facilitate the other parent's relationship with the child is an important factor. See 750 ILCS 5/602.7(b)(13) (West 2024). While this factor does weigh in Father's favor, it is important to emphasize that courts "shall consider *all* relevant factors." (Emphasis added.) 750 ILCS 5/602.7(b) (West 2024). The circuit court addressed all statutory factors in its decision, and, as discussed hereafter, we believe consideration of all pertinent factors supports its decision. Further, the judgment included conditions meant to mitigate the problem of interference in both parties' relationships with Jaiden. As we noted previously, the circuit court ordered both parties to refrain from making disparaging remarks about the other in the presence of the child, to allow the child to call the other parent whenever she wanted, and to include both parents, Eli, and all four grandparents as contacts on Jaiden's electronic devices.

¶ 127   Father further contends that the presence of snakes in Mother and Eli's home constitutes "a significant environmental factor" and "is a concern, not only from the standpoint of safety for

the child, but from the economic sense of caring for the snakes." With respect to the economic burden of caring for the snakes, Father notes that Eli had not yet sold any snakes. At trial, however, Father presented no evidence regarding any danger the snakes might pose to Jaiden and no evidence concerning the cost of caring for them. Indeed, he testified that his only concern was that no one told him how many snakes were in the house, what types of snakes they were, or where they were being kept. He acknowledged that these concerns were adequately addressed in a response Mother's attorney provided to his request for information on the matter. As such, the record contains no evidence that the snakes had any adverse impact on Jaiden's well-being or best interests. Moreover, Father did not argue that they did before the circuit court. Any issue not raised in the circuit court is deemed forfeited on appeal. *In re G.L.*, 2017 IL App (1st) 163171, ¶ 28.

¶ 128   Finally, Father correctly contends that a circuit court may not consider evidence of conduct that does not have an impact on the child's best interests. See 750 ILCS 5/602.7(c) (West 2024). However, he does not explain what conduct the circuit court improperly considered, and the record does not establish that the circuit court considered any improper matters in rendering its decision. We must presume that the circuit court knows and properly follows the law. *In re G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 129   Moreover, considering the overall record as it relates to all pertinent factors, we find ample support for the circuit court's decision. The circuit court expressly found that the Talking Parents communications supported Mother's concerns with Father's ability and willingness to follow treatment protocols for Jaiden. The GAL believed that although Jaiden loved Father, she was far more comfortable with Mother and Eli. In addition, although there was conflicting testimony concerning the degree of Father's involvement in caregiving duties prior to the parties' separation, there was no dispute that Mother provided much of Jaiden's daily care, arranged her medical

appointments, and did most of the homeschooling. In view of these circumstances, we cannot say the circuit court's decision to allocate the majority of parenting to Mother was contrary to the manifest weight of the evidence.

¶ 130 We note that after addressing factors related to the allocation of parenting time, Father concludes by stating that the circuit court should have allocated equal parenting time "and joint decision-making on all decisions regarding the child." Mother argues that including the issue of decision-making responsibilities "in a conclusory sentence does not place same at issue on appeal where all other arguments made and law cited solely relates to the issue of parenting time." We agree. This court "is not merely a repository into which" appellants may dump the burden of conducting research and developing their arguments. *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 143; see Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that arguments not raised in an appellant's opening brief are forfeited).

¶ 131 Moreover, were we to consider the issue, we would find that the evidence supports the circuit court's decision to give Mother sole decision-making responsibility regarding medical and education issues. The testimony of both parties, as well as the Talking Parents messages clearly established that the parties argued over these matters to an extent that made joint decision-making extremely difficult if not impossible. See 750 ILCS 5/602.5(c)(4) (West 2024) (mandating consideration of the ability of the parents to cooperate in decision-making and "the level of conflict between the parties that may affect their ability to share decision-making"). We conclude that the evidence supports the circuit court's allocation of both parenting time and decision-making responsibilities.

37

¶ 132                                    B. Relocation

¶ 133   Father next contends that the circuit court's decision to grant Mother's petition for relocation was against the manifest weight of the evidence. We agree.

¶ 134   The paramount question in a relocation case is whether the proposed move is in the best interests of the child. *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79 (1996). The parent seeking permission to relocate must prove by a preponderance of the evidence that doing so would be in the best interests of the child. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65.

¶ 135   In determining whether a proposed relocation is in the child's best interest, the circuit court must consider the following factors: (1) the circumstances and reasons for the proposed move; (2) the reasons for any objection to the proposed relocation by the other parent; (3) the history and quality of each parent's relationship with the child, including whether any parent has failed to exercise parental responsibilities allocated to him or her; (4) the educational opportunities available to the child at both locations; (5) the presence or absence of extended family members at both locations; (6) the anticipated impact the relocation will have on the child; (7) the circuit court's ability to fashion a reasonable allocation of parental responsibilities if the relocation is allowed; (8) the wishes of the child; (9) possible arrangements for exercising parental responsibilities that are appropriate to the circumstances and the parties' resources; (10) minimization of any impairment to the parent-child relationship caused by the relocation of the other parent; and (11) any other relevant factors. 750 ILCS 5/609.2(g) (West 2024). Determination of a child's best interests "cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending to a great extent upon the circumstances of each case." *Kavchak*, 2018 IL App (2d) 170853, ¶ 65 (citing *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988)).

¶ 136　On appeal, we do not "reweigh the competing considerations." *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. Instead, we review the circuit court's decision deferentially. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. This deference is warranted because the circuit court had the opportunity to observe both parents and the child and is therefore able to evaluate their temperaments and personalities. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. We will reverse a decision on relocation only if it is against the manifest weight of the evidence. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. A decision is against the manifest weight of the evidence if the record clearly calls for the opposite conclusion to the one reached by the circuit court or if the decision depends on factual findings that "are clearly, plainly, and indisputably erroneous." *In re P.D.*, 2017 IL App (2d) 170355, ¶ 18. There is a strong and compelling presumption in favor of the circuit court's ruling. *Fatkin*, 2019 IL 123602, ¶ 32. Despite this strong and compelling presumption, our review of the record indicates that there are pertinent circumstances and factors the circuit court failed to adequately consider.

¶ 137　The first factor we must consider is the circumstances and reasons Mother requested permission to relocate. 750 ILCS 5/609.2(g)(1) (West 2024). As both the circuit court and GAL found, Mother indicated she wanted to relocate because she would be closer to her biological family and the support they could provide as well as a job offer that would allow her to work around her medical limitations. The extent to which the move might enhance Mother's financial security and provide her with a support network are proper considerations. A circuit court may consider evidence that a custodial parent's quality of life will likely be enhanced by the proposed move "as long as the court is satisfied that it has a bearing on the child's best interests." *Kavchak*, 2018 IL App (2d) 170380, ¶¶ 88-89. However, the focus must be on the child's best interests. *Kavchak*, 2018 IL App (2d) 170380, ¶ 88; *In re P.D.*, 2017 IL App (2d) 170380, ¶ 34.

¶ 138   Here, Mother has shown that, at least in the short-term, the proposed move would improve her economic circumstances due to the existence of a job offer and her ability to stay with her biological parents until she is back on her feet financially. This would raise Jaiden's standard of living as well. However, we do not believe Mother has demonstrated to what extent, if any, her long-term economic circumstances would improve. Mother admitted that after she stopped working as a veterinary technician in 2023, she did not apply for any other jobs in Illinois. Although she offered detailed testimony concerning the difficulties she might encounter due to her medical limitations, she did not establish what type of earning capacity she would have if she stayed in Illinois. We emphasize that Mother, as the parent requesting relocation, bore the burden of proof. See *Kavchak*, 2018 IL App (2d) 170853, ¶ 65.

¶ 139   Mother also sought to relocate due to the potential benefit of the support network her biological family could provide. However, we believe the circuit court overlooked the newness of Mother's close relationship with her biological parents. There is no dispute that their relationship with Mother developed quite recently or that they did not provide her with financial support or any type of parental commitment until March 2023. This is understandable, given that Mother had an adoptive family. Nevertheless, this was an untested relationship of unknown stability. While the support the Gunnins are now offering to Mother and Jaiden may favor relocation to some degree, we believe the circuit court at the very least must consider the untested nature of their commitment to Mother in deciding how much weight to give the potential benefits of this new relationship. The circuit court does not appear to have done so.

¶ 140   We will next address Father's reasons for opposing the move. See 750 ILCS 5/609.2(g)(2) (West 2024). As discussed previously, Father was concerned that that relocation would limit the time he spent with Jaiden and harm their relationship. There was substantial evidence to support

40

his concern. The parenting schedule called for Father to have one weekend of parenting time per month in Illinois and allowed him to have an additional weekend with Jaiden each month if he chose to travel to Pennsylvania. It also provided for each parent to have six weeks of uninterrupted parenting time during the summer and divided the holidays between the parents. Realistically, however, it is not clear that Father will be able to exercise all the weekend parenting time allocated to him. Gunnin testified that it took him over 13 hours to drive to Illinois to visit Mother, and the GAL expressed her concern that flights between St. Louis and Philadelphia would be cost-prohibitive. We emphasize that a child has "an interest in maintaining *significant* contact with both parents following a divorce." (Emphasis in original.) *In re Marriage of Krivi*, 283 Ill. App. 3d 772, 777 (1996) (citing *Eckert*, 119 Ill. 2d at 325).

¶ 141    The next statutory factor for consideration is the history and quality of each parent's relationship with the child and whether either parent failed to exercise the parental responsibilities allocated to them. 750 ILCS 5/609.2(g)(3) (West 2024). Here, there is no dispute that Jaiden is very much loved by both Father and Mother. There is likewise no dispute that both parents have exercised all the parenting time allotted to them. The circuit court correctly found that both parents had good a good relationship with Jaiden. It went on to find that Mother and Eli were her primary caregivers. The evidence supports this finding. However, while it is highly relevant in allocating parenting time and decision-making responsibilities, we do not believe Mother's role as the primary caregiver is a pertinent consideration in determining whether relocation is in the child's best interests under the circumstances of this case. It is worth noting that the requirements for seeking judicial approval to relocate only apply to a parent who has been allocated at least half of the parenting time with the child. See 750 ILCS 5/609.2(b), (c), (f) (West 2024). As such, if the mere fact that a parent is the primary caregiver were a significant consideration in a case such as

41

this, where both parents have been engaged with the child, this factor would nearly always favor relocation. To the extent the circuit court considered Mother's role as the primary caregiver in finding that relocation was in Jaiden's best interests, we believe it erred.

¶ 142   The next statutory factor concerns the educational opportunities available to the child at both locations. 750 ILCS 5/609.2(g)(4) (West 2024). Mother provided ratings of Alton Community School District No. 11 and the Spring-Ford Area School District, where she intended to move, which were based on academics, teachers, clubs and activities, college preparation, diversity, and administration. The reports from Niche.com she offered into evidence also included information on graduation rate, average SAT and ACT scores, college admissions, student-teacher ratios, student diversity, and expenditure per student. The overall grade Niche gave the Spring-Ford schools was A-plus, while the overall Niche grade for the Alton schools was B-minus. Contrary to Father's contentions, we believe this evidence was sufficient to support the circuit court's apparent finding that this factor favors relocation.

¶ 143   Another important factor is the presence or absence of extended family members at both locations. 750 ILCS 5/609.2(g)(5) (West 2024). Here, the evidence supports the circuit court's finding that Jaiden had bonded with Mother's biological parents in Pennsylvania. In addition, while it is not clear how much of a bond Jaiden had with Mother's extended family members in Pennsylvania, Mother testified that Jaiden enjoyed spending time with them. However, the circuit court's findings related to Father's local family overlooked the benefits of preserving those relationships. The circuit court correctly noted that Father's parents moved to Mississippi before the final hearing in this matter. However, Father's father testified that they tried to schedule their visits home to coincide with Father's parenting time. The circuit court also noted that Father's brothers do not have children. This fact does not make Jaiden's relationship with her uncles any

less meaningful. In addition, while it is undisputed that Mother no longer has a relationship with her adoptive parents and did not have any local family, the record is silent as to any relationship with other members of her adoptive family who might live in Benton, where Mother grew up, or elsewhere in Illinois. Again, it is Mother who bore the burden of proving that relocation is in Jaiden's best interests. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65. While the circuit court appears to have found that this factor favors relocation, our review of all the pertinent evidence leads us to conclude it is neutral.

¶ 144    In addressing the impact of the proposed move on the child (750 ILCS 5/609.2(g)(6) (West 2024)), the circuit court stated, "From a status quo standpoint, the testimony is that in selling the marital residence, the child will have to move one way or the other." In so observing, the circuit court overlooked the significant difference between moving a child to a new neighborhood or a new town within the Metro East area and moving her to an entirely new location. As Father points out, Jaiden has numerous local connections, including friends, established medical providers, and a therapist. Although she may not see many of her friends as frequently after a local move, particularly the neighborhood children, she would still be able to see them on occasion. A move to Pennsylvania, by contrast, would cut Jaiden off from all her local friends and would also mean that she would have to adjust to a new therapist and new medical providers. Moreover, as the circuit court also observed, there was evidence that "from a financial standpoint the relocation may limit [Father's] ability to access and communicate with the child." As we have already discussed, children have an interest in having substantial contact with both parents. Thus, this is an important consideration. We believe this factor therefore weighs against relocation.

¶ 145    Another statutory factor is the wishes of the child, taking into account the child's level of maturity and ability to express a reasoned, independent preference regarding relocation. 750 ILCS

43

5/609.2(g)(8) (West 2024). As the circuit court correctly observed, there was little evidence concerning Jaiden's preference. Moreover, as the GAL noted in her report, Jaiden was too young to make a reasoned, independent decision. Thus, we agree with the circuit court that this factor is not particularly relevant under the circumstances of this case.

¶ 146   The next factors for consideration are whether the circuit court will be able to fashion a reasonable allocation of parental responsibilities if the relocation occurs and any possible arrangements for exercising parental responsibilities that are appropriate to the parents' resources and circumstances. 750 ILCS 5/609.2(g)(7), (9) (West 2024). Regarding its ability to fashion a reasonable allocation of parental responsibilities, the circuit court merely noted that Mother believed such an allocation was possible while Father did not. As to any possible arrangements appropriate to the parties' resources and circumstances, the circuit court simply noted that Father and the GAL expressed concerns regarding the problems posed by the distance.

¶ 147   A reasonable allocation of parenting time "is one that will preserve and foster the child's relationship with the noncustodial parent." *In re Marriage of Gibbs*, 268 Ill. App. 3d 962, 968 (1994). Here, the parenting time schedule provides for Father to have six weeks of uninterrupted parenting time during the summer and one weekend of parenting time per month with Jaiden in Illinois during the school year. It also allows Father up to one additional weekend per month of parenting time if he chooses to visit Jaiden in Pennsylvania. This reduces the total amount of time Father can spend with Jaiden compared to the temporary parenting order, pursuant to which Father had parenting time every other weekend and every Wednesday night. It also results in "large gaps in time between visits," which does not help a noncustodial parent maintain and foster a relationship with the child. See *In re Marriage of Sale*, 347 Ill. App. 3d 1083, 1089 (2004).

44

¶ 148 Moreover, even assuming the parenting plan is reasonable on its face, we do not believe it takes into account the circumstances of the case, particularly the feasibility of travel for weekend parenting time in view of the parties' limited financial resources and historic inability to cooperate. See *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 76; *Krivi*, 283 Ill. App. 3d at 778. It is undisputed that driving from the Metro East to Phoenixville, Pennsylvania, requires two full days on the road. This would take up nearly all of Father's weekend parenting time. In addition, given the parties' limited financial resources, paying for air fares once a month, much less twice per month, is not a realistic option. Father testified that he did not believe transportation would be feasible. The circuit court acknowledged his concerns but did not address the feasibility of transportation options in view of the parties' financial limitations. Realistically, then, Father is unlikely to be able to exercise all the weekend parenting time afforded to him. It is difficult to see how such an allocation of parenting time will preserve and foster his relationship with Jaiden. We therefore believe these two factors weigh against relocation.

¶ 149 The next statutory factor for consideration is steps to minimize the impairment of the child's relationship with a parent caused by the other parent's relocation. 750 ILCS 5/609.2(g)(10) (West 2024). Here, the circuit court did attempt to minimize the impairment of Father's relationship with Jaiden by ordering both parties to allow her to talk to the other parent at any time while she is in their care and by ordering the parties to include contact information for both parties, Eli, and all grandparents in Jaiden's electronic devices. While we commend the circuit court's effort in this regard, we do not believe it is adequate to mitigate the likely impairment of Father's relationship with Jaiden. For one thing, these provisions may be more difficult to enforce if Mother moves to Pennsylvania. Moreover, while it is possible to foster a parent-child relationship through electronic communication and phone calls, it is far easier to foster a relationship with a young child

45

if the parent can spend substantial time with the child in person. See *In re P.D.*, 2017 IL App (2d) 170355, ¶ 59 (Hutchinson, J., specially concurring) (observing that while electronic communication can be helpful, young children have "little patience for or understanding of the technology").

¶ 150    Finally, the statute governing relocation directs the circuit court to consider any other factor it finds relevant to the child's best interests. 750 ILCS 5/609.2(g)(11) (West 2024). The circuit court in this case expressly found that no other factors were relevant. We disagree.

¶ 151    In particular, we find that some of the factors the circuit court considered in determining the allocation of parenting time that would best serve Jaiden's interests were likewise pertinent to its decision regarding relocation. The willingness and ability of each parent to foster the other parent's relationship with Jaiden was a significant consideration under the facts of this case. See 750 ILCS 5/602.7(b)(13) (West 2024). Both parties accused the other party of speaking disparagingly about each other in Jaiden's presence, and both parties denied these allegations. However, the GAL offered concrete examples of harmful comments Jaiden reported hearing from Mother about Father. The circuit court did not consider the extent to which Mother's history of undermining Father's relationship with Jaiden might impact her willingness and ability to cooperate in arranging transportation under the parenting order and otherwise fostering and encouraging Father's relationship with Jaiden from a distance.

¶ 152    Another significant factor the circuit court did not address as it related to relocation was Jaiden's adjustment to her home, school, and community. See 750 ILCS 5/602.7(b)(6) (West 2024). As we discussed previously, relocation will sever Jaiden's relationship with her friends in a way that a local move will not. Although perhaps not as important, there was also evidence that

Jaiden enjoyed going to local parks and attractions and that she participated in activities such as swimming lessons and jiujitsu.

¶ 153   Stability and continuity are important considerations in determining any child's best interests. See *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33; see also *Hefer*, 282 Ill. App. 3d at 77. However, these concerns are even more crucial for Jaiden given her history. Jaiden came into the parties' care as a foster child when she was four years old. Although the record reveals little about her life before she was placed with Father and Mother, she obviously experienced some disruption. In addition, Father testified that Jaiden experienced verbal abuse in a previous foster home.[6] Perhaps unsurprisingly, Jaiden has been diagnosed with adjustment disorder. Thus, consideration of her adjustment to her community and other factors affecting her sense of stability, including the stability of her relationship with both of her parents, was central to a determination of her best interests.

¶ 154   We recognize that this was a difficult case involving conflicting testimony and unusual circumstances. We further recognize that the circuit court addressed each of the statutory factors in its decision and that some of those factors favor relocation. However, due to "the case-by-case nature of our review, the result cannot be reduced to a simple tally of which party 'won' a majority of the enumerated factors." *Levites*, 2021 IL App (2d) 200552, ¶ 71. In any given case, some factors will weigh more heavily than others due to the particular circumstances of the case. *Levites*, 2021 IL App (2d) 200552, ¶ 71 (citing *In re P.D.*, 2017 IL App (2d) 170355, ¶ 49).

¶ 155   As we have just discussed, Jaiden's need for stability looms particularly large in this case, a factor that should have been considered in determining whether relocation was in her best

---

[6]Similarly, Eli testified that a previous foster parent told Jaiden that she was not being adopted because she threw "temper tantrums."

interests. In addition, it was incumbent on the circuit court to balance any benefit from the move against the devastating impact it likely would have on Father's relationship with Jaiden given the parties' demonstrated inability to cooperate, Mother's history of undermining Father's relationship with Jaiden, and the realistic feasibility of travel between the two residences given the parties' limited financial resources. See *Levites*, 2021 IL App (2d) 200552, ¶ 76. Because the circuit court's decision does not take these crucial matters into account, we find that the record in this case clearly calls for the opposite conclusion from the one reached by the circuit court. As such, the decision to grant Mother's petition to relocate is against the manifest weight of the evidence. See *In re P.D.*, 2017 IL App (2d) 170355, ¶ 18.

¶ 156   Finally, we note that, although we have affirmed the circuit court's decision to award the majority of parenting time to Mother, the specific schedule set forth in the parenting plan incorporated into the judgment was designed with Mother's proposed relocation in mind. We must therefore vacate that portion of the order to allow the circuit court to amend the schedule of parenting time to suit parents living in closer proximity.

¶ 157                                 III. CONCLUSION

¶ 158   For the foregoing reasons, we affirm the circuit court's decision to allocate the majority of parenting time to Mother; we reverse the decision to allow Mother to relocate to Pennsylvania; and we vacate the parenting plan and remand this matter to the circuit court with directions to determine a schedule of parenting time appropriate to parents living in the same local vicinity.

¶ 159   Affirmed in part; reversed in part; vacated in part; cause remanded with directions.